FIRST NATIONAL BANK OF BRAINERD v. JAMES C. FLYNN and Another.

January 17, 1899.

Nos. 11,355—(226).

**Foreclosure of Mortgage—Fraud upon Wife—Finding as to Mortgagee not Sustained by Evidence.**

At the trial of an action brought to foreclose a mortgage covering the statutory homestead of defendants (husband and wife), the court found as a fact that the wife's signature to the instrument was obtained by false and fraudulent representations made to her by her husband as to what property was therein described, and also found that the agent of plaintiff mortgagee, its representative in the transaction, knew of, and was a party to, the fraud. *Held*, that the last-mentioned finding was entirely unsupported by the evidence.

From an order of the district court for Morrison county, Searle, J., denying a motion for a new trial, plaintiff appealed. Reversed.

*W. S. McClenahan*, for appellant.

It is a general and just rule that, when a loss has happened which must fall on one of two innocent persons, it shall be borne by him who is the occasion of the loss, even without any positive fault committed by him, but more especially if there has been any carelessness on his part which caused, or contributed to, the misfortune. Somes v. Brewer, 2 Pick. 183, 201; Miller v. Powers, 119 Ind. 79. Where one of two innocent persons must suffer by the fraud or

negligence of a third, whichever of the two has accredited him ought to bear the loss. Mundorff v. Wickersham, 63 Pa. St. 87; Schultz v. McLean, 93 Cal. 329.

To charge the plaintiff with responsibility for a fraudulent understanding between its agent Chiperfield and defendant Flynn, the evidence must be clear, strong and convincing beyond a reasonable controversy, that such an understanding existed. See Maxfield v. Schwartz, 45 Minn. 150; McCall v. Bushnell, 41 Minn. 37; Minneapolis, St. P. & S. Ste. M. Ry. Co. v. Chisholm, 55 Minn. 374; Oxford v. Nichols & Shepherd Co., 57 Minn. 206; Lennon v. White, 61 Minn. 150; Howland v. Blake, 97 U. S. 624; Pool v. Ellison, 56 Hun, 108; Newton v. Holley, 6 Wis. 564; Condit v. Dady, 56 Ill. App. 545; Crookston Imp. Co. v. Marshall, 57 Minn. 333; Kercheval v. Doty, 31 Wis. 476, 491.

A deliberate deed of writing is of too much solemnity to be brushed away by loose and inconclusive evidence. Howland v. Blake, supra; Lennon v. White, supra; Maxfield v. Schwartz, supra; Albitz v. Minneapolis & P. Ry. Co., 40 Minn. 476; 2 Kent, Com. 484. The uncorroborated testimony of a party is not highly regarded in cases of this character. Murphy v. Dunning, 30 Wis. 296.

*Taylor & Jenks*, for respondent.

As between the original parties, one who has intentionally deceived the other to his prejudice is not to be heard to say, in defense of the charge of fraud, that the innocent party ought not to have trusted him. Maxfield v. Schwartz, 45 Minn. 150; Shrimpton & Sons v. Philbrick, 53 Minn. 366; Gibbons v. Bente, 51 Minn. 499; Gardner v. Trenery, 65 Iowa, 646; Redding v. Wright, 49 Minn. 322; De May v. Roberts, 46 Mich. 160.

When it is shown that a paper had its inception in fraud, one relying on it must show affirmatively that he is not tainted with the fraud, and that he had no knowledge of the fraud. See Canajoharie v. Diefendorf, 123 N. Y. 191; Cummings v. Thompson, 18 Minn. 228 (246); Bank of Montreal v. Richter, 55 Minn. 362; Vosburgh v. Diefendorf, 119 N. Y. 357, 360; Giberson v. Jolley, 120 Ind. 301; Mace v. Kennedy, 68 Mich. 389; Goodrich v. McDonald, 77 Mich. 486;

Haggland v. Stuart, 29 Neb. 69; Sullivan v. Langley, 120 Mass. 437; Stewart v. Lansing, 104 U. S. 505.

COLLINS, J.

Defendants are husband and wife, residents of Little Falls, while plaintiff's place of business is at Brainerd, 32 miles distant. At the time of the transaction hereinafter mentioned, defendant husband was the owner of a full lot, and part of another, in block 7, in said Little Falls, on which was a business block; and he was also the owner of lots 7 and 8 in block 42,—his dwelling house being upon lot 7. Both of these tracts of ground seem to have been "corners." and it appears that defendants, when speaking with each other about the business block, usually called it "our corner." This designation was sufficiently definite as between themselves, according to the evidence.

This was an action brought to foreclose a mortgage upon lots 7 and 8,—in the form of a warranty deed,—executed and delivered April 3, 1896, to plaintiff by defendants to secure the husband's indebtedness in the sum of $2,500.

The wife alone answered, alleging that the property in question was, and for more than eight years had been, the statutory homestead of defendants, and that her signature to the deed had been obtained by means of false and fraudulent representations on the part of her husband and plaintiff's agent as to the tract of ground therein described and conveyed. The answer also contained other and sufficient averments in reference to the alleged fraud, and demanded that foreclosure of the mortgage be denied and the conveyance adjudged null and void.

At the conclusion of a trial by the court, without a jury, the findings of facts were in favor of defendant wife; and, as a conclusion of law, it was ordered that judgment be entered canceling and annulling the conveyance as to lot 7, which was found to be the homestead, and canceling and annulling it as to lot 8 in so far as it purported to convey the wife's inchoate interest therein. Personal judgment was ordered against the defendant husband for the amount of his note, and a sale of his interest in lot 8.

The court expressly found that the husband, deliberately and for

the purpose of inducing his wife to sign the deed, deceived her as to the tract of land described, by stating and representing to her in the hearing of plaintiff's agent, present for the purpose of obtaining the security, that it was the business "corner" before referred to, and that said

"Agent was present, and heard all the conversation, and made no objection thereto, and that he had full knowledge of the facts, and was a party to the deception practiced upon the defendant" wife.

Plaintiff's motion for a new trial having been denied, it appealed from the order.

It is urged by counsel for plaintiff that several of the findings of fact, and especially that above quoted, upon which the conclusion of law must have been based, are not supported by the evidence. We agree with counsel as to the quoted finding; for there is no evidence in the record tending to connect plaintiff's agent (an attorney at law by the name of Chiperfield) with the fraud upon which counsel for defendant wife plant their case.

That this may be fully demonstrated, we will detail the attending circumstances, and Mrs. Flynn's version of the transaction. As before stated, Little Falls is 32 miles from Brainerd. Chiperfield practiced law at the latter place, and seems to have been sent to Little Falls by plaintiff for the purpose of examining the title to the real estate, preparing the deed of conveyance and obtaining defendants' signatures thereto. He made the necessary examination at the court house, drew the deed and then found Mr. Flynn at the hotel, where the latter signed. They then went to Flynn's residence, on lot 7, for the purpose of obtaining Mrs. Flynn's signature, but found her absent. She was at a church making preparations for Easter services.

Chiperfield had been acquainted with Mrs. Flynn for some years, but what his acquaintance was with her husband does not appear. It was not shown that Chiperfield had ever been in Little Falls prior to this occasion or that he had any knowledge as to Flynn's business or property. In his examination of the title he may have discovered that lot 8, adjoining 7, on which was the dwelling house, was a corner lot; and this he could have easily seen when at the

house with Mr. Flynn.   Both men then went to the church; Mr. Flynn having with him, as he testifies, two other papers, concerning the business corner before mentioned, to which he wished to secure his wife's signature.   On reaching the church, Mrs. Flynn was called to the door, and there met the men.   What then happened was related by Mrs. Flynn, when testifying, as follows:

"Our conversation at first was purely friendly, of course, when I met Mr. Chiperfield; and the papers were referred to, and the question of the ink and pen was brought up.   There was no ink and no pen upstairs, and it was sent downstairs for, as I suggested.   I understood that every one was in a hurry, because Mr. Chiperfield had to catch the train.   The pen and ink were secured as quick as possible.   We went into the vestry of the church.   The papers were laid on the table before me.   I asked the question, as I always did, to what property these papers referred.   Mr. Flynn had done so much business in land and papers in regard to property, that I was in the habit of signing them.   I had signed a good many.   Mr. Flynn replied they referred to 'our corner.'   I remember that distinctly.   The block was often spoken of as 'our corner' or 'our block.'   I took it that the papers referred to the block.   I did not look them over, and considered that I did not have the time to do so; and I supposed the question that I asked, and the answer I received, was sufficient."

Questions and answers followed, thus:

"Q. What was this property that was known and designated as the 'block'?   A. That block that Mr. Flynn built on the corner of Broadway and First streets.   Q. The business block?   A. Yes, sir; had been referred to several years, and years before the block was put up there, and afterwards, as 'our corner' or 'our block.'   Q. The matters concerning that block had been somewhat complicated?   A. Yes, sir; very much so.   I had signed quite a number of papers, previous to that, concerning the block.   Q. Was Mr. Chiperfield there during all this transaction?   A. Mr. Chiperfield was present through it all.   Q. Did he say anything?   A. He said nothing.   Q. He heard it all?   A. He did, unless his hearing is defective.   Q. Mr. Flynn at different times has done a large business in the matter of handling and transferring real estate?   A. Yes, sir.   Q. For years?   A. Yes, sir.   Q. You had been in the habit of signing deeds when he presented them for signature?   A. Yes, sir.   Q. Your information as to what the property was depended on what?   A. Entirely on what I was told.   I know no more about numbers of blocks than—   Q. Did you know at that time the number of the lot and block on which the homestead was?

A. I did not; no, sir.　Q. Did you know the number of the lot and block on which the business block was?　A. No, sir.　Q. Then, if you had read this deed, you would not know whether it referred to the homestead or not?　A. No, sir.

On cross-examination Mrs. Flynn stated that, had she read the papers (the deed now involved, and those presented by Mr. Flynn), she would not have known what property was described, or that they affected different lots, and that she was not posted with reference to descriptions.　The latter part of her cross-examination was as follows:

"Q. You do not, as I understand, charge or claim that Mr. Chiperfield at that time did anything, either by word or act, to deceive you?　A. Mr. Chiperfield did nothing.　I question whether it was his duty—　Q. And you have never thought, and do not now think, do you, that he, either by word or act, at that time did anything to deceive you?　A. I think he did.　Q. Have you not, Mrs. Flynn, stated to Mr. Chiperfield that you do not think that he had any thought of deceiving you,—that he had any intention of it?　A. I don't just exactly know how the words that I used in my letter might be interpreted.　I wrote Mr. Chiperfield a letter, and I felt at the time that he had not intentionally done me any wrong.　Q. That is the letter which you wrote to Mr. Chiperfield concerning this transaction, is it not?　A. Yes, sir."

The letter was put in evidence, marked "Exhibit D."　Mrs. Flynn then testified:

"I never thought Mr. Chiperfield intentionally wished to do me a wrong."

Exhibit D (the letter from Mrs. Flynn to Mr. Chiperfield) was written about the time this action was commenced, and in it was this paragraph:

"I did not intend to accuse you of deceiving me, and do not think you had any such thought, but I am as sure there was no explanation given me as I am that I live and breathe."

Mr. Flynn's testimony in respect to what transpired at the church did not differ from that of his wife, and there were no other witnesses, except Mr. Chiperfield, whose testimony was taken by deposition in another state.　Mr. Flynn practically admitted that

he deceived his wife when obtaining her signature, because he did not want her to know that their house was being mortgaged. He also stated that, after Mrs. Flynn had signed, he went with Chiperfield to the court house, where the latter paid taxes due upon the property, and placed the deed on record.

We have thus detailed every particle of evidence through which an attempt was made to connect plaintiff's agent with the alleged fraud, and, as before stated, there is nothing whatsoever which tends to indicate Chiperfield's knowledge or participation. For us to even infer that he knew of the fraud, we should have to say that although, so far as shown, he was a stranger in Little Falls, and totally ignorant of Flynn's property holdings, outside of the lots he proposed to mortgage, Chiperfield knew that Flynn owned a business block in that place, and had also learned that this block was on a corner, and, further, in some unaccountable manner, had discovered that when Mr. and Mrs. Flynn were talking over business matters, and referred to "our corner," they meant the business corner, and not the corner on which they resided.

The facts are that, unfortunately for the wife, she had placed confidence in her husband, and for years had relied upon his statements as to the contents of instruments brought for her signature. Although a lady of education and culture, she knew nothing of land descriptions; so that, had she read the deed, she would have discovered nothing wrong about it.

This answers the suggestion that the necessity of Chiperfield's taking a train soon to arrive affected the transaction. She trusted the whole matter to her husband, and he practiced a fraud in the presence of Chiperfield, an innocent witness of the defendants' signatures to the conveyance. The fraud complained of was the act of her husband alone, and the result of the wife's own fault and negligence. All of this is conclusively established by her own testimony, in which she exculpates Chiperfield from all charges of bad faith, expressly admits that he had no intention of deceiving and places the culpability where it belongs.

To hold that on such facts the plaintiff's security could be swept away would render it unsafe for any person to have business transactions with a married man involving the taking of a real-estate

mortgage. The law which is to be applied to the evidence where an attempt is made to avoid an instrument for fraud in its execution has often been stated by this court, and we need not cite authorities.

Order reversed and a new trial ordered.